IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NATHAN ALLEN ATWATER, | CASE NO. 1:20-CV-00735 |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| v. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Nathan Allen Atwater filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to me for a report and recommendation pursuant to General Order 2021-06, with Automatic Reference of Administrative Action pursuant to Local Rule 72.2. (Non-document entry dated May 26, 2021). Following review, and for the reasons stated below, I recommend the Commissioner's decision be **REVERSED and REMANDED.**

### PROCEDURAL BACKGROUND

Mr. Atwater filed for SSI on October 7, 2016, alleging a disability onset date of September 27, 2016. (Tr. 12). His claims were denied initially and upon reconsideration. (*Id.*). Mr. Atwater then requested a hearing before an administrative law judge ("ALJ"). (*Id.*). Mr. Atwater (represented by counsel) and a vocational expert ("VE") testified at a hearing before the ALJ on December 14, 2018. (Tr. 36–59). On February 4, 2019, the ALJ issued a written decision finding that Mr. Atwater was not disabled. (Tr. 9–32). The Appeals Council denied Mr.

Atwater's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6). *See* 20 C.F.R. §§ 416.1455, 416.1481. Mr. Atwater timely filed this action on April 5, 2020. (Doc. 1).

## FACTUAL BACKGROUND

## I.    ADMINISTRATIVE HEARING

The following represents a summary of the testimony presented in the December 14, 2018 hearing before the ALJ:

As related by his counsel, Mr. Atwater's primary impairments are traumatic brain injuries ("TBI"), neurocognitive disorder, and bipolar disorder, although he also has osteoarthritis and other physical impairments that limit his ability to stand or walk for periods longer than thirty minutes. (Tr. 37–38, 50)*.* In addition, Mr. Atwater has a longstanding diagnosis of seizure disorder that is controlled with medication, aside from periodic breakthrough episodes. (*Id*.)*.* In September 2016, Mr. Atwater was in a motor vehicle accident in which he suffered a second TBI and fractured his pelvis. (Tr. 37–38).

During the hearing, Mr. Atwater stated that since the September 2016 accident, he has experienced "severe memory loss" and "trouble reasoning and solving problems and issues." (Tr. 45–46). He "struggle[s] to keep [his] mind focused" on the tasks at hand, and his relatives help him to keep his appointments and other activities. (Tr. 46). He testified he has trouble focusing and concentrating, and "tend[s] to get sidetracked and distracted a lot." (*Id*.)*.* When that happens, he "usually get[s] anxious" but is not always able to control his frustration. (*Id*.)*.* He can no longer enjoy TV or movies—they do not catch his interest and he has trouble focusing. (*Id*.)*.* Mr. Atwater also testified he only leaves his house for groceries. (Tr. 48). He does not always attend church because he "tend[s] to get paranoid . . . around great big groups of people." (*Id*.)*.*

Mr. Atwater described his bipolar and other mental disorders as follows: "Usually, my mood is okay, but I have a real problem dealing with pressure and anxiety, and so my mood changes a lot and very rapidly, and sometimes that's basically why I take medication for anxiety and depression, because my mood sometimes is uncontrolling [*sic*]." (Tr. 47). These disorders have affected his sleep; he sleeps only for 3–4 hours at night because his "mind sometimes just won't shut down." (*Id.*). Mr. Atwater stated he takes his medication as prescribed, but these symptoms of bipolar disorder, anxiety, and depression persist. (Tr. 48).

At the hearing, Mr. Atwater was at times unable to follow the ALJ's questioning and gave contradictory answers.[1] (*See* Tr. 52). For example, although Mr. Atwater said he paid his own bills by check, he also testified he did not have a bank account. (*Id.*). On further questioning, Mr. Atwater clarified that his mother pays his phone bill for him. (*Id.*). He lives in subsidized housing and does not pay rent, but if he did, his mother would cover his rent and ensure timely payments as well. (*Id.*).

Next, the ALJ posed two hypotheticals to the VE, asking whether a hypothetical individual the same age, education, background, and work experience as Mr. Atwater, who could lift up to 20 pounds, stand for six hours in an eight-hour workday and sit six hours in an eight-hour workday, and only do simple routine tasks with no strict production quotas, would have any work in the national economy. (Tr. 54–55). In response, the VE testified the individual would be classified as a sedentary RFC (residual functional capacity) and could perform unskilled work at

---

[1]  Additionally, Mr. Atwater has experienced issues in the accuracy of his responses to yes/no questions elsewhere in the record. (*See, e.g.*, Tr. 690). A treating physician noted after Mr. Atwater's August 2018 seizure that he "answers yes or no questions but again the accuracy of these is unclear." (*Id.*).

an SVP 2 (Specific Vocational Preparation). (Tr. 55). Representative jobs include a hand packager, cleaner, or garment sorter. (*Id.*).

The second hypothetical assumed the same facts as above, except the worker would also need to be off task for seven percent of the day, would need to have instructions repeated, and would only be able to have occasional interaction with the public, coworkers, and supervisors. (*Id.*)*.* That worker would only be able to stand for four hours or sit for six hours in an eight-hour workday. (*Id.*). The VE testified a person of that skill level could work as an inspector, sorter, or table worker. (Tr. 56). However, if that person needed a flexible break schedule, it would require accommodating non-competitive work. (*Id.*).

Mr. Atwater's attorney also posed a hypothetical to the VE: Assuming the same facts as above, except the individual would not be able to maintain concentration for extended periods for approximately twenty percent of the time. (Tr. 57). In response, the VE testified that employers generally would not tolerate an employee who is unable to maintain concentration more than eight percent of the workday. (*Id.*)*.* Similarly, if the employee would require direct supervision and active redirection to stay on task for approximately a third of the workday, the VE testified it would be a significant accommodation and no competitive work would be available. (*Id.*).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Mr. Atwater was born on December 2, 1980 and was 35 years old at the time his application was filed. (Tr. 25). He is therefore defined as a younger individual, age 18–44, under the Social Security Act. *Id. See also* 20 C.F.R. § 416.963. Mr. Atwater has intermittently performed part-time work, but he has not been employed in work that meets the standard of "substantial gainful activity" ("SGA") under the Social Security Act. (*Id.*)*. See also* 20 C.F.R.

4

§ 416.920(a). His most recent employment was in 2016 prior to his motor vehicle accident; he was in a supported employment program for persons with disabilities. (Tr. 212). Mr. Atwater has no past relevant work experience. (Tr. 25).

## III.   RELEVANT MEDICAL EVIDENCE

Mr. Atwater's medical history as it relates to his asserted disability is summarized below.

### A.   Previous History of Disability

In 1997, as a teenager, Mr. Atwater fell from the back of a moving truck and suffered a TBI. (Tr. 230). He was in a coma for several weeks following the accident and needed physical, occupational, and speech therapy to regain basic functioning. (Tr. 270). As a result, Mr. Atwater was found to have the following medically determinable impairments: borderline intellectual functioning, cognitive disorder, and traumatic bi-frontal encephalomalacia. (Tr. 65). Mr. Atwater was found disabled by the Commissioner and received disability from 2003–2010; his SSI was suspended after he represented himself at a redetermination hearing. (Tr. 387).

### B.   Currently Asserted Disability

The ALJ found Mr. Atwater has the following severe impairments: history of pelvic fracture with degenerative joint disease and advanced osteoarthritis of both hips, history of TBI, degenerative disc disease of the lumbar spine, seizure disorder controlled with medications, and bipolar disorder. (Tr. 15). These impairments significantly limit Mr. Atwater's ability to perform basic work activities as provided in SSR 85-28. (*Id.*).

#### 1.   Medical Opinion Evidence

##### a.   Accident Reports from Mansfield Hospital Emergency Department and Grant Medical Center

On September 27, 2016, Mr. Atwater was involved in a motor vehicle accident on I-71. (Tr. 326). Emergency crews found him conscious, alert, and oriented. (*Id.*). He had a left

acetabular fracture, bilateral pubic rami fractures, concussion, and brow and left elbow lacerations. (Tr. 332). After the accident, Mr. Atwater was initially treated in the Mansfield Hospital Emergency Department by Jason Straus, M.D. (Tr. 330). Dr. Straus noted Mr. Atwater was "severely concussed" and was a "poor historian and quite amnestic to the event." (*Id.*). Dr. Straus noted Mr. Atwater's psychiatric history and stated "[h]e had confabulated the idea that his niece was kidnapped by an inmate at Mansfield Correctional Institute. He had called 911 and told them that. He felt he was chasing the people who kidnapped her. The police were involved, and said that the story is fictitious." (*Id.*). Mr. Atwater was then transferred to Grant Medical Center for treatment of his fractures. (Tr. 329–30). His records on transfer to Grant Medical Center noted he was "confused on admission to trauma bay" at Mansfield Hospital, and was alert as to time and person but disoriented as to place and situation. (Tr. 363). Mr. Atwater was treated at Grant Medical Center from September 27, 2016 to October 10, 2016. (Ex. C-2F; Tr. 361–539).

Notes from his speech pathologist at Grant Medical Center state Mr. Atwater had moderate speech cognition with a significant psychological component: Mr. Atwater "reported seeing spiders all over him" and moved during the session "as if swatting away bugs." (Tr. 379). A lab technician reported that Mr. Atwater was having a conversation with an imaginary person. (*Id.*). Mr. Atwater's Cognitive Log score during this time was assessed at 13/30. (*Id.*). He could not recall months past September and "then got distracted and could not be successfully refocused," he "forgot where to stop" when counting seconds, and he could not respond appropriately when given a home safety scenario. (*Id.*). The speech pathologist noted moderate cognitive dysfunction, but suspected the concussion from Mr. Atwater's accident was "likely only a minimal factor." (*Id.*) She further theorized the cause was "significant psych issues as opposed to PCS [post-concussion syndrome]." (*Id.*).

Similarly, the notes from Mr. Atwater's occupational therapist reveal Mr. Atwater's decreased awareness of his need for safety. (Tr. 410). He needed additional time for follow through in his cognitive activities, and was "able to follow *one-step* commands with increased time." (*Id.*).

### b.        Bipolar Disorder and Treatment by Catalyst Health Services

From at least April 2014 through May 2018, Mr. Atwater received regular treatment for his mental health issues from Catalyst Health Services. (*See* Ex. C-7F, C-11F, C-14F, C-15F, C-18F). Mr. Atwater's treating clinician at Catalyst Health Services was Debbie Marshall, PMHNP-BC.[2] In a Mental Status Questionnaire dated December 13, 2016, Ms. Marshall noted that Mr. Atwater exhibited some thought blocking, and that he was euthymic[3] with an odd affect. (Tr. 613). She also referenced Mr. Atwater's September 2016 motor vehicle accident and the related delusions, and stated that he sustained a second TBI. (*Id.*). His orientation was otherwise concrete at the session. (*Id.*). However, Ms. Marshall noted that his concentration and insight were lacking, his memory impaired, and his judgment fair to poor. (*Id.*). In addition, she noted that Mr. Atwater was "limited" in his abilities to remember, understand, and follow directions; maintain attention; sustain concentration, persist at tasks, and complete them in a timely fashion; and social interaction and adaptation. (Tr. 614). Ms. Marshall stated that Mr. Atwater would react "poorly" to the pressures involved in simple and routine, or repetitive, work-related tasks. (*Id.*).

---

[2]        Ms. Marshall is a board-certified Advanced Practice Psychiatric Mental Health Nurse Practitioner.

[3]        "Euthymic" refers to "moderation of mood, not manic or depressed" in those affected by bipolar disorder. *Euthymia*, *Stedmans Medical Dictionary* (2014).

In her psychiatric progress notes, Ms. Marshall described Mr. Atwater's mental health disorders as well controlled under his current medications. (Tr. 616). His pelvis was healing nicely after the accident. (*Id.*). In her social history notes, she states: "He was denied disability but recently reapplied. . . .  He receives [a] medical card from JFS but does not receive food stamps d/t failing to complete update[d] ppw [*sic*]. His mother is paying for his monthly groceries. In this clinician's opinion, he is certainly a good candidate for disability." (*Id.*). These social history notes are consistent and remain relatively unchanged throughout the progress notes provided by Catalyst Health Services. (*See id*; *see also, e.g.*, Tr. 619, 622, 625, 629, 632, 635, 638, 641).

Mr. Atwater was also seen by Francis I. Swarn, M.D., at Catalyst Health Services on March 1, 2016. (Tr. 647). At this appointment, Dr. Swarn notes that Mr. Atwater was cooperative and pleasant, had concrete thought processes, and no delusions noted, but that his insight and judgment were "fair to poor." (*Id.*). Dr. Swarn's notes similarly indicate Mr. Atwater's mother supports him and that he was not receiving disability. (*Id.*).

In later reports in 2017 and 2018, Mr. Atwater had difficulty sleeping and reported a reversed sleep schedule; his medications were adjusted to accommodate. (Tr. 781–830). However, after the seizure episode in August 2018, Ms. Marshall noted significant behavioral changes, including a self-reported 10/10 for depression. (Tr. 831). He was fixated on "something to treat [his] depression" and fixated on Ms. Marshall's "failure to find 'something that works'" despite previously reporting doing well on the medications she prescribed. (*Id.*). He stated he felt as if this depressive episode lasted "forever" and that he "must have lied" about improvement in his previous visits. (*Id.*). Mr. Atwater has a history of stopping the use of his psychotropic medications due to complaints of side effects, despite using these medications for months

without issue. (*Id.*). Ms. Marshall's report reflects a deterioration in judgment and insight, observed problems with his memory, halted speech, and that his attention was lacking and he appeared agitated and confused. (Tr. 832). She also noted "some flavor of underlying mania/psychosis to his presentation today." (*Id.*). She also states that he is typically very cooperative, pleasant, and mellow, whereas that day he was slightly agitated and demanding. (*Id.*). At the next session, Mr. Atwater was improved, despite a recurrence of his sleep problems. (Tr. 835–842).

Ms. Marshall also completed a Mental RFC Assessment for Mr. Atwater on October 15, 2018. (Tr. 843–48). In it, she marks fourteen of the twenty-one issues as moderate, *i.e.* "able to perform designated task or function, but has or will have noticeable difficulty (distracted from job activity) from 11-20 percent of the work day or work week (*i.e.*, more than one hour/day or more than one-half day/week)." (*Id.*). Seven out of the twenty-one issues were rated as moderately severe, *i.e.* "able to perform designated task or function, but has or will have noticeable difficulty (distracted from job activity) more than 20 percent of the work day or work week (*i.e.*, more than one hour and up to two hours/day or one-half to one day/week)." (*Id.*). In her assessment, Ms. Marshall notes "memory impairment likely [secondary] to TBI's and ongoing seizures. Intellectual appears to be in the Borderline range, however no formal testing available. Patient hospitalized [secondary] to seizures last month—severe behavioral/cognitive/ personality changes noted following this—some mild improvement [after] med changes over last several weeks." (Tr. 848).

### c.    Podiatric Treatment by Drs. Bansal and Zimmerman

From February through April 2017, Arun Bansal, M.D., and Brian Zimmerman, D.P.M., treated Mr. Atwater for gout in his right foot, hyperlipidemia, and a bunionectomy.  (Tr. 658–

73). In the initial visit on February 27, 2017, Dr. Zimmerman diagnosed gout and a bunion deformity on the right foot, which Mr. Atwater reported having for 20 years. (Tr. 673). In his progress notes from March 17, 2017, Dr. Bansal also includes a recommendation that Mr. Atwater "bring form from job & family welfare dept [*sic*] to be completed so as to get food stamps as p[atien]t is not able to work given his current issues and also reports scheduled for toe surgery 3/31/17 by podiatry. . . . given his chronic Dx [diagnosis] of schizoaffective disorder & epilepsy had [been] out of [the] workforce for [a] few years now." (Tr. 659).[4] After surgery, Mr. Atwater experienced some swelling and splitting of his stitches and was placed on antibiotics; shortly after, the swelling had decreased, and no infection was noted when the stitches were removed on April 4, 2017. (Tr. 667–69).

### d.      Seizure Disorder and Treatment by Dr. Tan

Mr. Atwater has a diagnosed seizure disorder and receives treatment from Dr. Gubert Tan, M.D. (Tr. 772). In August 2018, Mr. Atwater suffered a breakthrough seizure, likely caused by medication noncompliance during the week prior. (Tr. 706). He previously suffered breakthrough seizures in June 2014, October 2016, and February 2018. (Tr. 688–693, 697, 772).

Dr. Tan notes Mr. Atwater's seizures are a "chronic problem" that started in 1997 after the accident that caused the first TBI. (Tr. 772). In late October 2016, Mr. Atwater suffered an episodic bout of seizures that lasted over a week. (*Id.*). During that period, Mr. Atwater had more than ten seizures, each lasting 30–120 seconds, characterized by rhythmic jerking and loss of

---

[4]      Neither Mr. Atwater nor the Commissioner reference a complaint of "schizoaffective disorder" in Mr. Atwater's SSI appeal. However, bipolar disorder can present with hallucinations and other symptoms similar to schizoaffective disorders. AM. PSYCHIATRIC ASS'N, THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 152 (5th ed. 2013). There is evidence in the record that Mr. Atwater has experienced such schizoaffective-type symptoms. *See, e.g.*, Tr. 330, 379.

consciousness. (*Id.*). At his treatment with Dr. Tan shortly thereafter, Mr. Atwater appeared alert and was not disoriented, with a normal mood and affect. (Tr. 773).

After his breakthrough seizure in August 2018, Mr. Atwater was notably affected. At his mental health appointment the week after the seizure, Ms. Marshall observed that Mr. Atwater was "quite confused today and even slightly hostile/agitated, which is out of character for him." (Tr. 831). She also stated there were "definitely personality changes noted which appear to be organic." (*Id.*).

### 2. State Agency Evaluations

#### a. Dr. Swearingen

T. Rodney Swearingen, Ph.D., a psychologist, provided a psychological evaluation of Mr. Atwater on February 9, 2017. Dr. Swearingen found the following DSM-5 Diagnostic Impressions: mild neurocognitive disorder due to TBI, mild alcohol use disorder (in sustained remission), and moderate Bipolar I disorder. (Tr. 654).

In his evaluation, Dr. Swearingen notes that Mr. Atwater could not recollect the reason for not finishing high school (after the initial TBI) and responded with "Too old, maybe?" (Tr. 652). As to Mr. Atwater's mental status, Dr. Swearingen noted he was cooperative, stable, and had an appropriate affect. (Tr. 653). He was alert and oriented as to person, place, time, and situation, and could name the current and immediate former presidents of the United States. (*Id.*). However, Dr. Swearingen also noted that Mr. Atwater "experiences mood swings to anger, anxiety, and depression" and at times "has had so much energy that he was not tired and did not feel the need to sleep." (*Id.*). During these episodes, "he has irritable mood, is impulsive, has racing thoughts, and is somewhat suspicious and paranoid. . . ." (*Id.*). To cope, he "cleans his

apartment, rearranges the furniture, and relaxes and talks on the phone." (*Id.*). Mr. Atwater related that he hears voices. (*Id.*).

Dr. Swearingen conducted a psychometric test and found that Mr. Atwater has a Full Scale IQ of 70 according to the Weschler Adult Intelligence Scale, Fourth Edition (WMS-IV). (Tr. 654). He obtained a Verbal Comprehension Composite Score of 72, a Perceptual Reasoning Composite Score of 81, a Working Memory Composite Score of 71, and a Processing Speed Composite Score of 74. (*Id.*). As to Mr. Atwater's WMS-IV Memory Scale score, he obtained an Auditory Memory Index Score of 69, a Visual Memory Index Score of 81, a Visual Working Memory Index Score of 71, an Immediate Memory Index Score of 70, and a Delayed Memory Index Score of 72. (*Id.*). This represents that Mr. Atwater "will have more difficulty retaining and recalling oral directions and information." (*Id.*).

As to his work history, Dr. Swearingen noted Mr. Atwater had never been fired from a job and got along with his coworkers and supervisors without problems, although he left his position at AVI Food Systems because he did not like the management. (*Id.*). In his functional assessment, Dr. Swearingen found that Mr. Atwater was "having problems following oral directions at work because of memory problems and needs to have them repeated. He has trouble following written instructions. His reading and writing are good and his comprehension [is] fair. He needs to reread instructions and is better at hands-on." (Tr. 655). Mr. Atwater "has trouble performing repetitive tasks because of his concentration and following directions. He said when he is stressed at work, he talks it out. After work, he will go home and nap. He stated he is unable to work now because of his physical health. He fractured his pelvis and he has arthritis in his feet." (Tr. 652). According to Dr. Swearingen's assessment, Mr. Atwater "is impaired in sustaining concentration and persisting in work-related activity at a reasonable pace" because he

is "easily distracted, cannot multitask, begins and does not finish tasks, and gets sidetracked." (Tr. 655). Mr. Atwater is "impaired in dealing with normal pressures in a competitive work setting." (*Id.*).

### b. State Agency Evaluators

State agency evaluators reviewed Mr. Atwater's medical history, including Dr. Swearingen's examination, and noted his limitations in understanding, memory, sustained concentration, and persistence. (Tr. 89). According to the evaluator's opinion, Mr. Atwater has physical impairments that limit his ability to do some types of work, but that he would be able to perform sedentary work (Tr. 93–94). As to his mental impairments, the medical evidence showed he has some limitations in the ability to remember and concentrate on tasks and interactions with others. (*Id.*). And although he can perform simple repetitive tasks, he should not be in a work environment with strict production quotas. (Tr. 90). Due to his mental health impairments, Mr. Atwater "will need flexible breaks when symptoms increase." (*Id.*).

### THE ALJ'S DECISION

The ALJ's decision dated February 4, 2019 included the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since October 7, 2016, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: history of pelvic fracture with degenerative joint disease and advanced osteoarthritis of both hips, history of traumatic brain injury, degenerative disc disease of the lumbar spine, seizure disorder controlled with medications, and bipolar disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as

defined in 20 CFR 416.967(a) except that the claimant can stand and walk for four hours in an eight hour workday. He can sit for six hours in an eight hour workday. He should not climb ladders, ropes, and scaffolds. He should avoid workplace hazards such as moving machinery and unprotected heights. The claimant can perform simple repetitive tasks with no strict productions or fast pace. He can have occasional superficial interactions (superficial being that which is beyond the performanace [*sic*] of job duties and job functions for a specific purpose and a short duration) with the general public, and occasional interaction with coworkers and supervisors. He can adapt to occasional changes in the workplace that are well explained. He is expected to be off task 7% of the time due to his mental impairments.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on December 2, 1980 and was 35 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since October 7, 2016, the date the application was filed (20 CFR 416.920(g)).

(Tr. 15–26). With these findings, the ALJ determined Mr. Atwater was not disabled under

§ 1614 (a)(3)(A) of the Social Security Act. (Tr. 27).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial

14

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 Fed.App'x 636, 641 (6th Cir. 2013) (cleaned up). A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted).

Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). *See also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)-(f). *See also Walters*, 127 F.3d at 529.

To evaluate the severity of mental impairments in adults, the Commissioner applies a "special technique" at each step of the five-step analysis. 20 C.F.R. § 404.1520a. Under this special technique, the Commissioner first evaluates pertinent symptoms, signs, and laboratory

findings to determine whether a claimant has a medically determinable impairment. 20 C.F.R. § 404.1520a(b)(1). These are known as the Paragraph A criteria. If the Commissioner finds a medically determinable impairment, it then rates the degree of functional limitation resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2).

Assessing functional limitations is "a complex and highly individualized process that requires [the Commissioner] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c). The Commissioner uses all relevant medical and nonmedical evidence in the record to evaluate a claimant's functional limitations. *Id*. The Commissioner rates the degree of functional limitation based on the extent to which the claimant's impairment interferes with the "ability to function independently, appropriately, effectively, and on a sustained basis," and therefore considers "such factors as the quality and level of [the claimant's] overall functional performance, any episodic limitations, the amount of supervision or assistance [the claimant] require[s], and the settings in which [the claimant is] able to function." *Id.*

The Commissioner uses a five-point scale (none, mild, moderate, marked, and extreme) to rate the claimant's degree of limitation in four broad functional areas: the ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. Collectively, these are known as the Paragraph B criteria. *Id.* To satisfy the Paragraph B criteria, a claimant's mental disorder must result in either an extreme limitation of one, or marked limitation of two, Paragraph B areas of mental functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Paragraph C criteria are used to evaluate "serious and persistent" mental disorders. *Id.* The Paragraph C criteria are intended to recognize that mental health treatments may control the

more obvious symptoms of the claimant's mental health disorder. *Id*. Paragraph C criteria are satisfied when the evidence shows the claimant relies on ongoing medical treatment, therapy, psychosocial supports, or a highly structured setting to diminish the symptoms of the mental disorder. *Id.* In addition, Paragraph C criteria are satisfied when the evidence shows the claimant is able to obtain only "marginal adjustment" even when the above supports diminish the claimant's mental health disorder symptoms. *Id.* Such "marginal adjustment" means the claimant has minimal capacity to adapt to changes in environment, has deterioration in functioning, and may be unable to function outside of the home or supportive setting. *Id.* Evidence may also show this deterioration has resulted in significant changes in medication, absence from work, or hospitalization. *Id.* Meeting these factors satisfies the Paragraph C criteria.

DISCUSSION

On appeal, Mr. Atwater argues: (1) The ALJ improperly evaluated the applicable listings; (2) the ALJ's RFC determination is not supported by substantial evidence; and (3) the language of the ALJ's decision did not comply with Social Security Ruling ("SSR") 16-3P or HALLEX I-2-8-25(A) because the ALJ used personal judgments or opinions to discount the evidence of the record. (Pl.'s Br., PageID 981, 989, 992). I will address each of these in turn.

**I.      The ALJ's decision properly evaluated Listing 12.02.**

Mr. Atwater argues the ALJ improperly evaluated Listing 12.02, relating to neurocognitive disorders, by only discussing the Paragraph B and C criteria and failing to address the Paragraph A criteria. (Pl.'s Br. PageID 989). [5] The Commissioner did not respond to this argument.

---

[5]      Although Mr. Atwater did not address it in his brief, this analysis applies equally to Listing 12.04.

A claimant is eligible for benefits if the impairment or combination of impairments meets or equals an impairment found in the applicable Listing. *See* 20 C.F.R. §§ 404.1520, 416.920. *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Neurocognitive disorders such as TBIs are evaluated under Listing 12.02. *Id.* Listing 12.02 has three Paragraphs, designated A, B, and C; the claimant's mental disorder must satisfy the requirements of both Paragraphs A and B, or the requirements of both Paragraphs A and C. *Id.* Paragraph A includes the medical criteria that must be present in the claimant's medical evidence; Paragraph B provides the functional criteria assessed in conjunction with a rating scale to evaluate how the mental disorder limits the claimant's functioning; Paragraph C provides the criteria used to evaluate "serious and persistent mental disorders." *Id.*

The ALJ's decision did not address the Paragraph A criteria. (*See* Tr. 15–18). However, the ALJ's decision need not address Paragraph A criteria if those criteria are addressed in Paragraphs B and/or C. *Innocent v. Saul*, No. 1:18CV2391, 2020 WL 1031531, at *10 (N.D. Ohio Mar. 3, 2020). By discussing whether the Paragraph B and C criteria were satisfied, an ALJ may implicitly find that the Paragraph A criteria were met. *Id.* That is what happened here. The ALJ's decision discussed Paragraphs B and C criteria in full. (Tr. 15–18). Therefore, I conclude there was no error inasmuch as the ALJ implicitly found the Paragraph A criteria were met.

## II.     The RFC determination in the ALJ's decision is not supported by substantial evidence.

Mr. Atwater argues the ALJ's determination of his RFC is not supported by substantial evidence for two reasons: (1) the ALJ erroneously discounted the opinions of the examining and treating mental health professionals,[6] instead relying on personal lay opinion; and (2) the ALJ's

---

[6]     The "Treating Physician Rule" was rescinded by the *Revisions to Rules Regarding the Evaluation of Medical Evidence*, for all cases filed after March 27, 2017. 82 Fed.

RFC does not adequately account for Mr. Atwater's limitations in concentration, persistence, or pace. (Pl.'s Br. Page ID 982, 987). I find these assertions to be well-taken.

An ALJ must "consider all of the available evidence in the individual's case record in every case." SSR 06-03p. Although there is a distinction between what an ALJ must consider and what an ALJ must explain in the determination, an ALJ "generally should explain the weight given to opinions from these 'other sources' or otherwise ensure that the decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* Although evidence may support an ALJ's finding, such evidence must be viewed with the record taken as a whole and must take into account both positive and negative factors as to the claimant's capacity. *Brooks*, 531 Fed.App'x at 641. There must be a logical bridge between the evidence and the result. *Fleischer*, 774 F.Supp.2d at 877. Here, when the record is considered as a whole, the "logical bridge" in the ALJ's decision is tenuous, particularly given the medical evidence.

As a subsequent reviewer, I find the reasoning in the ALJ's decision difficult to follow. The decision either discounts or gives no weight to the opinions of Mr. Atwater's mental health providers, gives weight to his podiatrist's statements regarding a different claimant, and disregards the examining psychologist's findings regarding Mr. Atwater's functional capacity. Mr. Atwater's subjective claims appear to be given greater weight than the opinions of his medical providers or the examining psychologist.

---

Reg. 5844 (2017). Because Mr. Atwater filed his application for SSI on October 7, 2016, his appeal is considered under the prior standard, applicable for cases filed prior to March 27, 2017. For purposes of Mr. Atwater's appeal, an "acceptable medical source" is one listed in 20 C.F.R. § 404.1513(a), *i.e.*, a licensed physician, psychologist, optometrist, podiatrist, or a qualified speech-language pathologist, depending on the disability asserted. 20 C.F.R. § 404.1513(a) (eff. until Mar. 27, 2017).

**A.     The ALJ's decision did not properly consider the evidence of Mr. Atwater's treating nurse practitioner under the standard set forth in SSR 06-03p.**

Mr. Atwater contends the ALJ erred in failing to consider properly the opinion of his treating Psychiatric Mental Health Nurse Practitioner, Debbie Marshall, PMHNP-BC. (Pl.'s Br. PageID 985–87). Under the Treating Physician Rule, which governs cases filed before March 27, 2017, the opinion of a treating physician or other acceptable medical source should be given "controlling weight" absent authority to the contrary. 20 C.F.R. § 404.1527(c)(2) (eff. Aug. 24, 2012–Mar. 26, 2017). However, a nurse practitioner is not an "acceptable medical source," cannot provide a medical opinion for purposes of an SSI determination, and is therefore not afforded controlling weight. *Desantis v. Comm'r of Soc. Sec.*, 24 F.Supp.3d 701, 711 (S.D. Ohio 2014). Because the ultimate determination of disability rests with the Commissioner and not a medical provider, an ALJ is not bound by the opinions of a claimant's medical provider. *Walters*, 127 F.3d at 529–31. Accordingly, the ALJ's determination states "[Ms. Marshall's] opinion is given little weight, as a licensed practical nurse is not considered an appropriate medical source" and "Ms. Marshall, as a nurse practitioner, is not considered an acceptable medical source, his [*sic*] opinion would be controlling [*sic*]." (Tr. 21, 25).[7] The Court agrees, as far as these statement goes.

But the Court disagrees that Ms. Marshall's opinion as a psychiatric mental health nurse practitioner should be dismissed without further discussion of its merits. A nurse practitioner is

---

[7]     Neither a licensed practical nurse nor a nurse practitioner is an "acceptable medical source" for purposes of the Treating Physician Rule. There is, however, a material difference between these professional credentials, and referring to Ms. Marshall as a "licensed practical nurse" greatly mischaracterizes the advanced credentials she holds. A licensed practical nurse holds a diploma or associate's degree in nursing, is not a specialist, and typically focuses on basic nursing care such as checking vital signs or inserting catheters. In contrast, a nurse practitioner is an advanced credential, often specialized, and includes the ability to diagnose, treat, and prescribe medications.

an "other source" that the agency "may also use [as] evidence . . . to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d) (eff. Sept. 3, 2013–Mar. 26, 2017). This is further supported by now-rescinded Social Security Ruling ("SSR") 06-03p, which addressed how an ALJ was to consider opinions from sources who were not deemed "acceptable medical sources" on the issue of disability. SSR 06-03p (eff. Aug. 9, 2006–Mar. 27, 2017). The ruling recognized that an "acceptable medical source" may not be the claimant's main provider, due to the growth of managed health care in recent years. *Id*. It stated: "Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.*[8]

Here, Ms. Marshall is a nurse practitioner with specialization in the field of mental health treatment. *See* fn. 2, *supra*. Of all the medical providers in the record, Ms. Marshall provided the most regular and consistent treatment to Mr. Atwater. She treated him regularly from 2014–2018 and assisted with his mental health treatment during all critical stages at issue in his case: his seizures in 2014, 2016, and 2018; his car accident in 2016; and his foot surgery in 2017. (*See* Exh. C-7F, C-11F, C-14F, C-15F, C-18F). As a medical provider with the most longitudinal experience with Mr. Atwater, her opinion cannot but have an effect on the outcome of the case.

The ALJ's decision discounted Ms. Marshall's opinions by finding them inconsistent with the treatment notes and Mr. Atwater's claimed ability to live on his own. (Tr. 24–25). But the discounting of Mr. Atwater's "benign" mental health reports reflects a misunderstanding of

---

[8]    SSR 06-03p was rescinded effective March 27, 2017. *See* 82 FR 15263 (Mar. 27, 2017).

bipolar disorder and its effects. Bipolar disorder is not consistent; it is characterized by severe episodes in which the individual's mood can swing between mania, hypomania, or depression. DSM-5, 123–26. These mood episodes can last for a few days or weeks and can occur multiple times a year. *Id.* Some individuals can return to a fully functional level between episodes, but approximately thirty percent have severe impairment in work role function. *Id.* at 131.

Moreover, characterizing Mr. Atwater's condition as "benign" disregards multiple instances in the record of hallucinations, manic episodes, and major depressive episodes. (Tr. 613, 622, 625, 677, 781). It ignores the effects of his seizure disorder and TBIs. (*See, e.g.*, Tr. 831). And, while Mr. Atwater appears to maintain a generalized level of control over these issues through medication, there are also multiple instances in the record where his medications caused severe side effects, were insufficient to control his symptoms and needed to be changed, or where he had difficulty remembering if he had taken his medications.[9] (*See, e.g.*, Tr. 616, 619, 638, 781, 802, 831). Reflected in Ms. Marshall's progress notes are Mr. Atwater's paranoid delusions, racing thoughts, odd affect, impaired memory, disordered sleep, and fair to poor judgment. (Tr. 613, 622, 677, 790, 811, 819). In others, he reported difficulty in making decisions and irritability, which were most prevalent at work. (Tr. 641, 790). In other reports, Mr. Atwater went without sleep for 4 or 5 days, his energy was elevated, his speech pressured, and he had paranoid thoughts. (Tr. 625). Ms. Marshall's treatment notes frequently revealed severe mental health episodes that cannot support characterizing Mr. Atwater's mental health status as "benign."

---

[9]     Medication noncompliance can also be a feature of bipolar disorder; some studies have found that up to 50 percent of patients with bipolar disorder were noncompliant with their medications. *See* Ibrahim Jawad et al., *Medication Nonadherence in Bipolar Disorder: A Narrative Review*, 8 THER. ADV. PSYCHOPHARMACOL, 349–363 (Dec. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6278745/.

Moreover, the statement that Mr. Atwater's ability to live in his own apartment is inconsistent with medical opinion does not fully reflect the record evidence about Mr. Atwater's independence *vel non*. (Tr. 21). It is also inconsistent with the standards set forth in the Listings for mental health disorders. The SSA explains how it considers the evidence in the record by stating:

> Your ability to complete tasks in settings that are highly structured, or that are less demanding or more supportive than typical work settings does not necessarily demonstrate your ability to complete tasks in the context of regular employment during a normal workday or work week. . . Psychosocial supports, structured settings, and living arrangements, including assistance from your family or others, may help you by reducing the demands made on you. In addition, treatment you receive may reduce your symptoms and signs and possibly improve your functioning, or may have side effects that limit your functioning. Therefore, when we evaluate the effects of your mental disorder and rate the limitation of your areas of mental functioning, we will consider the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time, and the effects of any treatment.

20 C.F.R. Pt. 404, Subpt. P, App. 1. The types of support the SSA considers in assessing a claimant's functional capacity include: receiving help from family members or other people who monitor a claimant's daily activities, such as paying bills; participation in a supported work program, and creating a highly structured environment by eliminating all but minimally necessary contact with the world outside a claimant's living space. *Id.* Mr. Atwater meets these criteria.

An ALJ may properly weigh the credibility of a claimant against the opinions of medical providers where the claimant's reports are inconsistent with the medical evidence. *See, e.g.*, *Anthony v. Astrue*, 266 F. App'x 451, 455 (6th Cir. 2008) (claimant with seizure disorder was determined not disabled because of inconsistent medical reports and conflicting evidence that he was able to drive over 100 miles to attend church, exercised with 20-pound weights, took mile-

long walks, mowed his lawn, visited with family and friends, socialized at the American Legion, prepared meals at home, and managed daily living on his own).

Here, all of Mr. Atwater's medical providers and the examining physician agree he is restricted in daily activities, has difficulties in social functioning, has difficulty in maintaining concentration and staying on task, and has repeatedly had episodes of decompensation. And, while a claimant's ability to live alone may somewhat contradict these medical findings, that is not the case here. Mr. Atwater's description of his "independent" living conditions is consistent with medical opinion when compared to the factors described in 20 C.F.R. Pt. 404. Mr. Atwater is able to cook, clean his apartment, and maintain his hygiene. (Tr. 50–51).  But he does little else. He rarely leaves his apartment, and when he does, he only goes to the grocery store or to church. (Tr. 48). He often avoids attending church services due to his discomfort in large crowds. (*Id.*). Even when socializing with family, he primarily does so by telephone. (Tr. 653). He cannot regulate his sleep. (Tr. 47–48). And the cleanliness of his apartment is sometimes due to the effects of a manic episode. (Tr. 653). He lives just a few minutes' drive away from his mother and sees her regularly. (Tr. 52). She pays all bills for him, as he does not have a bank account in his own name. (*Id.*). He no longer maintains a driver's license after his 2016 accident. (Tr. 41).

It appears the reason Mr. Atwater is able to live on his own is due to "creating a highly structured environment" and "eliminating all but minimally necessary contact with the world outside [his] living space." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Viewed through this lens, Mr. Atwater's description of his living arrangements is not inconsistent with the medical reports and accords with the SSA's standards as outlined in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

**B.  The ALJ did not properly consider the evidence of Mr. Atwater's podiatrist and relied on a medical opinion for another claimant.**

The ALJ's decision describes Mr. Atwater's podiatric symptoms in their entirety as follows:

> Treatment notes from the claimant's podiatrist indicated that the claimant had a bunionectomy on his right foot in March 2017. Handwritten notes on the cover sheet from DDD, requesting information, indicate that the claimant had "healed [from his] surgery and is doing well – no disabil[ity] is needed" (Exhibit C-10F/4-5, 9; see also Exhibit C-12 F/56). This opinion is accepted as the adequate reflections of the claimant's limitations due to foot abnormalities, as it reflects the opinion of the claimant's treating podiatrist who specialized in this area of medical care.

(Tr.  23). This assessment of Mr. Atwater's abilities and limitations is incorrect, because the handwritten notes referenced were describing a different claimant. (Tr. 674–75). The records from that other claimant were mixed with Mr. Atwater's treatment records. (*See* Tr. 667–75). Although the progress notes reference Mr. Atwater's podiatric treatment, the DDD handwritten notes reference the *other claimant's* treatment from May 5, 2017 through August 15, 2017. (Tr. 675). Therefore, the assessment that Mr. Atwater had "healed [from his] surgery and is doing well – no disabil[ity] is needed" is incorrect. (*Id. See also* Tr. 23). The ALJ's reliance on another claimant's information as the basis for the decision necessitates reversal.

**C.  The ALJ's RFC does not adequately account for Mr. Atwater's limitations in concentration, persistence, or pace.**

Mr. Atwater alleges the RFC reflected in theALJ's decision does not adequately account for Mr. Atwater's limitations in concentration, persistence, or pace. (Pl.'s Br. PageID 987). He alleges both the nurse practitioner and the consultative examiner noted multiple limitations in his abilities:

- He is impaired in understanding, carrying out, and remembering instructions;

26

- He is impaired in sustaining concentration and persisting at work-related activities at a reasonable pace;
- He is impaired in dealing with normal pressures in a competitive work setting; and
- He is impaired in following directions, concentration, and stress tolerance;
- Maintaining attention;
- Sustaining concentration, persisting at tasks, and completing them in a timely fashion;
- Interacting socially;
- Adapting; and reacting to the pressure in work settings, involving simple, routine or repetitive tasks.
- Ability to maintain attention and concentration for extended periods; and
- Ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

(*Id.*). Mr. Atwater further contends that by failing to account for these limitations properly, the hypothetical posed to the VE was inadequate. (Pl.'s Br. PageID 988). In response, the Commissioner contends the ALJ's RFC finding was supported by substantial evidence. (Def.'s Br., PageID 1008). I concur with Mr. Atwater.

Through the first four steps of the sequential analysis, the claimant has the burden of proof, but at the fifth step, the burden of proof shifts to the Commissioner. 20 C.F.R. § 404.1520. To meet this burden, the Commissioner must make a finding, supported by substantial evidence, that the claimant has the necessary qualifications to perform specific jobs in the national economy. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) (cleaned up). The Commissioner may rely on the VE's testimony as substantial evidence to determine whether the claimant has these qualifications. *Id.* at 513–14. Such evidence is reliable only if the hypothetical question posed to the VE accurately portrays the claimant's individual physical and mental impairments. *Id.* The question need not specifically list the claimant's medical conditions, but it must provide the VE with an assessment of what the claimant can and cannot do. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

Here, the hypothetical question relied on in the ALJ's decision suggested a hypothetical individual who could stand/walk for four hours or sit six hours in an eight-hour day, should avoid all hazards including moving machinery, could tolerate simple tasks with no production quotas or fast-paced work, and would have occasional interaction with the public, co-workers, and supervisors. (Tr. 54–56). Any occasional changes would need to be well explained, and the hypothetical individual would be off task seven percent of the day. (*Id.*) According to the VE, and confirmed in the ALJ's decision, a hypothetical individual could perform sedentary jobs such as inspector, sorter, and table worker. (Tr. 26, 56).

This hypothetical, however, does not accurately reflect Mr. Atwater's limitations as described by his mental health providers and the state agency reviewing psychologists. In determining Mr. Atwater's RFC, the state agency reviewing psychologists noted he has limitations in understanding, memory, sustained concentration, and persistence limitations. (Tr. 89). In addition to the limitations contained in the above hypothetical, these experts stated Mr. Atwater "will need flexible breaks when symptoms increase." (Tr. 90). Dr. Swearingen noted Mr. Atwater has poor concentration and pace of task, has "problems following oral directions at work because of memory problems and needs to have them repeated," and has "trouble performing repetitive tasks because of his concentration and following directions." (Tr. 652). Ms. Marshall's mental RFC assessment indicates Mr. Atwater would be distracted no less than eleven percent of the work day or work week due to his limitations. (Tr. 846–47).

The failure to include these limitations in the hypothetical is fatal to the reliability of the VE's testimony. The VE testified that having a flexible break schedule would require "accommodating non-competitive work." (Tr. 56). Similarly, a hypothetical individual who would be absent more than one day a month on an unscheduled basis would not allow for the

28

performance of any competitive work. (Tr. 57). It would be work preclusive for an employee to be off task for eight percent of the work day. (*Id.*). And it would be a "significant accommodation" for the employee to require direct supervision and active redirection to stay on task for about one-third of the workday or work week on an ongoing basis. (Tr. 57–58).

Failing to include these limitations as recommended by multiple experts does not meet the substantial evidence standard for VE testimony as outlined in *Ealy* and necessitates reversal.

### III.    The ALJ's decision used personal judgments or opinions to discount the evidence of the record.

Mr. Atwater alleges the ALJ used personal judgments or opinions regarding his disability to discount the evidence in the record. The Commissioner provided no response to the contrary. I agree with Mr. Atwater.

As regards Ms. Marshall's assessment of Mr. Atwater's disability, the ALJ's decision states:

> The possibility always exists that a treatment provider may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports, and treatment providers might provide such a note in order to satisfy patient's requests and avoid unnecessary tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Tr. 25). This statement is unsubstantiated in the record, which discloses no evidence that Mr. Atwater "demanded" any particular opinion from any of his treating or examining medical providers. Moreover, an ALJ may not use "emotionally charged words" or "personal judgments or opinions" in a decision and may not use the decision "as a forum for criticizing . . . the claimant." (HALLEX I-2-8-25).

An ALJ's findings as to the credibility of the claimant are given great weight and deference because the ALJ is charged with the duty of observing witness demeanor and credibility. *Walters*, 127 F.3d at 531. The claimant's credibility is a particularly relevant issue for the ALJ to assess where there is an absence of sufficient objective medical evidence. *Id.* In such instances, the court will defer to the ALJ's judgment when the discounting of a claimant's credibility is appropriate and supported by an adequate basis, such as where there is contradictory evidence between medical reports, the claimant's testimony, or other evidence. *Id.* at 531–32. But where the medical reports are consistent, it is insufficient for an ALJ to rely only on a  subjective assessment of the claimant's credibility. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). An ALJ can rely on the claimant's credibility as the basis for making a determination where there is inconsistency in the medical opinions or where a claimant's testimony is exaggerated to the point of fabrication. *See, e.g.*, *Anthony v. Astrue*, 266 F. App'x 451, 458–60 (6th Cir. 2008) (ALJ's determination upheld where claimant's subjective statements and one medical opinion were inconsistent with the rest of the evidence); *Macy v. Sec'y of Health & Hum. Servs.*, 816 F.2d 681 (6th Cir. 1987) (per curiam) (ALJ's determination of no disability upheld where, despite all test results being within normal limits, claimant alleged it would take her four days to recover from walking two blocks to attend her administrative hearing, and where several physicians noted "psychosomatic exaggeration" in her record).

That is not the case here. The ALJ acknowledged relying on personal subjective opinion of the claimant's credibility rather than medical opinions when making the statement excerpted above. (Tr. 25). Elsewhere in the record, the ALJ discounts the medical evidence with subjective statements such as "[Dr. Swearingen] did not indicate the nature of the impairment except to repeat the claimant's statements about his abilities." (Tr. 23). Finally, the ALJ concludes the

30

RFC assessment by stating "the *subjective complaints* in the record do not support further reduction of the established residual functional capacity." (*Id.*). Throughout the assessment of Mr. Atwater's RFC, the ALJ uses such subjective statements to discount the medical evidence—except for the written statement by Mr. Atwater's podiatrist referencing another claimant's ability. (Tr. 23). In some cases, it might be appropriate to use a claimant's subjective reports to discount an inconsistent medical opinion. But on balance, the ALJ's use here is inconsistent with the record and is not afforded deference.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the ALJ's decision denying SSI not supported by substantial evidence. I therefore recommend the decision be reversed and the matter remanded.

Dated: July 9, 2021

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).**